```
UNITED STATES DISTRICT COURT                    (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
WILLIAM MCELROY,                     : 05 Civ. 5437 (JSR)(JCF)
                                     :
              Plaintiff,             :      REPORT AND
                                     :      RECOMMENDATION
      - against -                    :
                                     :
JOEL I. KLEIN, AS CHANCELLOR OF      :
THE NEW YORK CITY DEPARTMENT OF      :
EDUCATION, THE NEW YORK CITY         :
DEPARTMENT OF EDUCATION, AND THE     :
CITY OF NEW YORK,                    :
                                     :
              Defendants.            :
- - - - - - - - - - - - - - - - - -:
```

TO THE HONORABLE JED S. RAKOFF, U.S.D.J.:

William McElroy brings this action pursuant to the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201 et seq., and the New York State Labor Law, N.Y. Labor Law §§ 191(1)(a) and 652(1), seeking an award of back wages and overtime pay. He also asserts claims of breach of contract and quantum meruit. Mr. McElroy alleges that he was offered a job at the Wadleigh Secondary School for the Performing and Visual Arts ("Wadleigh"). He further alleges that he accepted the job and worked there for several months, but was paid only a small portion of the wages due him. The defendants have moved for summary judgment on all claims, and the plaintiff has cross-moved for summary judgment on his claims for relief under the FLSA and the New York Labor Law. For the reasons set forth below, I recommend that the defendants' motion and the plaintiff's motion each be granted in part and denied in part.

1

Background

In 2004, William McElroy sought employment as a video and audio technician. He met with Evelyn Collins, Assistant Principal of the Arts Department at Wadleigh, sometime in the summer of 2004.[1] Ms. Collins was interested in hiring a video technician for her department, and the plaintiff was referred to her by a teacher at Wadleigh. (Collins Dep. at 30). Mr. McElroy and Ms. Collins differ as to the exact sequence of meetings and exchanges that occurred, but they agree that the meetings went very well and that at some point Ms. Collins offered Mr. McElroy a job at the school and he accepted her offer. (Collins Dep. at 30, 33, 48-49; McElroy Dep. at 25, 74). According to Mr. McElroy, the position offered to him was that of computer technician, at a salary of $31,000 per year. (McElroy Dep. at 74). Ms. Collins claims that Mr. McElroy was initially offered a position as a video technician, a position that did not yet exist at the school, but that she hoped to create. (Collins Dep. at 30, 34). She says that at the time of the offer she thought that the video technician position she planned to create might be considered a computer technician job (Collins Dep.

_____

[1] Mr. McElroy claims that Ms. Collins first offered him a job in June of 2004 (Excerpts of Deposition of William McElroy dated April 12, 2006 ("McElroy Dep."), attached as Exh. H to Declaration of Marlen S. Bodden dated Nov. 9, 2006 ("Bodden Decl.") and as Exh. B to Declaration of Rippi Gill dated Aug. 25, 2006 ("Gill Decl."), at 74), while Ms. Collins remembers their first meeting as being in August of that year (Excerpts of Deposition of Evelyn Collins dated March 28, 2006 ("Collins Dep."), attached as Exh. C to Bodden Decl. and as Exh. O to Gill Decl., at 22).

at 86-87), but she also avers that she never told Mr. McElroy that he would definitely be hired as a computer technician or that he would be paid $31,000 per year.  (Collins Dep. at 89, 166).

Mr. McElroy claims that when he met with Ms. Collins in August of 2004 to discuss working at Wadleigh, he filled out tax forms and a job application form, which he then returned to her.  (McElroy Dep. at 39, 77, 102-03).  Ms. Collins denies giving Mr. McElroy any forms to fill out before the school year began (Collins Dep. at 49), and several Department of Education ("DOE") officials testified that they never received tax forms or other application materials from Mr. McElroy and have no such forms on file. (Declaration of Barbara Restivo dated June 14, 2006 ("Restivo Decl."), ¶¶ 4-5; Declaration of Judith Rivera dated June 14, 2006 ("Rivera Decl."), ¶¶ 7-9).  Mr. McElroy, meanwhile, has no copies of any tax forms or other job application materials and does not clearly recall the specifics of the forms he filled out.  (McElroy Dep. at 77, 102-04).

Ms. Collins testified that in order to hire Mr. McElroy, she sought the permission of Karen Watts, the principal of Wadleigh. (Collins Dep. at 30).  Ms. Watts approved of the hiring, but she informed Ms. Collins that the school could not hire Mr. McElroy as a computer technician becayse no such jobs were available. (Collins Dep. at 31, 87-88; Excerpts of Deposition of Karen Watts dated Sept. 3, 2004 ("Watts Dep."), attached as Exh. F to Bodden

3

Decl. and as Exh. E to Gill Decl., at 43-46).  Ms. Collins proposed hiring Mr. McElroy instead as a school aide, a lower-paid position, and Ms. Watts approved.  (Collins Dep. at 31; Watts Dep. at 44). Ms. Collins also met with Delores Stanton, the school's payroll secretary, to begin the process of hiring Mr. McElroy and adding him to the payroll.  (Collins Dep. at 33, 100).  According to Ms. Stanton, Ms. Collins discussed with her the possibility of hiring Mr. McElroy as either a computer technician or a school aide. (Excerpts of Deposition of Delores Stanton dated March 27, 2006 ("Stanton Dep."), attached as Exh. D to Bodden Decl. and as Exh. C to Gill Decl., at 73).  At some point, Ms. Stanton drafted a "letter of nomination" on behalf of Mr. McElroy and gave him a nomination form to fill out.  (Stanton Dep. at 13-14).

    In addition, at Ms. Collins's request, Ms. Stanton drafted a letter on September 3, 2004 referring Mr. McElroy for fingerprinting.  (Stanton Dep. at 60, 74, 93-94; Letter from Karen Watts dated Sept. 3, 2004 ("Watts 9/3/04 Letter"), attached as Exh. F to "Gill Decl.")  This letter, which was typed by Ms. Stanton and signed by her in Ms. Watts name, says that "the above referenced [Mr. McElroy] has applied for a position as a Computer Technician in this school and we wish to hire him in the near future." (Stanton Dep. at 60-63; Watts 9/3/04 Letter).  Mr. McElroy was fingerprinted the same day the letter was drafted and was cleared to work; however, it appears that the clearance was not processed

by the DOE until November 2004.   (Fingerprint Clearance Results, attached as Exh. G to Bodden Decl.; Stanton Dep. at 64).

Mr. McElroy began working at Wadleigh on Aug. 30, 2004, though his employment paperwork had not yet been processed.[2]  (McElroy Dep. at 39, 87; Letter from Evelyn Collins dated Oct. 28, 2004 ("Collins 10/28/04 Letter"), attached as Exh. I to Bodden Decl.; Time Sheets reflecting hours worked by William McElroy (the "time sheets"), attached as Exh. M to Bodden Decl.).   According to Mr. McElroy, he did not have an office or a daily schedule, but worked on assignments that were given to him by Ms. Collins, Ms. Watts, and other Wadleigh staff. (McElroy Dep. at 81-82).   The plaintiff explains that the work he did at Wadleigh consisted of repairing and troubleshooting computers at the school, working as a video technician, sound engineer, and sound designer on school plays and productions, shooting video for archival and public relations videos, running the school's television production studio, supervising installment of new equipment, repairing school film projectors, and training students in the use of video cameras. (McElroy Dep. at 81-86).   Ms. Collins confirms that Mr. McElroy

---

[2] Divining Mr. McElroy's start and end dates, his hours, and his duties at the school is complicated by the fact that he seems to have been working for other independent entities that operated at Wadleigh at the same time  that he was performing functions for the school itself. (Collins Dep. at 27, 33, 40, 63, 167; McElroy Dep. at 87).  It appears that Mr. McElroy may have already been working in the school for one of these entities -- called "the Valley" or "Greg Frelon/Valley" -- when he began working for Wadleigh.  (Collins Dep. at 33, 167).

assisted with video editing in a video production class, videotaped at least one school event, and worked on the sound for at least one school production. (Collins Dep. at 63).

Mr. McElroy claims that he worked essentially full-time (8:30 a.m. to 3:30 p.m. each day) from August 30, 2004 to December 2004. (McElroy Dep. at 85-86). His account is partially confirmed by time sheets upon which he recorded his hours for September and October of that year, which show that he worked a total of 170 hours at Wadleigh during those two months. These time sheets were apparently kept by Mr. McElroy at the urging of Ms. Stanton and then signed by Ms. Collins. (Collins Dep. at 64-65, 67-69; Stanton Dep. at 84-85). Ms. Collins and Ms. Stanton appear to have believed that the time sheets might allow Mr. McElroy to be paid for the period he had already worked once he was added to the payroll. (Collins Dep. at 65, 69).

At some point, Ms. Collins informed Mr. McElroy that Wadleigh would not be able to hire him as a computer technician and that the only position available was that of school aide. (Collins Dep. at 37; McElroy Dep. at 93). Ms. Collins recalls this conversation taking place between the time that she met with Ms. Watts, the principal, and the time that she spoke with Ms. Stanton about beginning Mr. McElroy's paperwork, which would have been in early September. (Collins Dep. at 37). Mr. McElroy, however, does not remember being offered the school aide position until October.

(McElroy Dep. at 153).  He says that he was reluctant to accept the position because the pay was much lower, but was convinced to do so by Ms. Collins and Ms. Stanton, in part because they told him that doing so might facilitate his obtaining back pay for the time he had worked.  (McElroy Dep. at 153-55).  Ms. Watts, for her part, remembers that it was she who told Mr. McElroy, in a conversation in mid-October, that he would have to work as a school aide, and she had Ms. Stanton begin the paperwork[3] for the school aide position at that time.  (Watts Dep. at 47-48).

Later, Mr. McElroy was informed that a hiring freeze had also been placed on school aide positions and that his application was delayed as a result.  (McElroy Dep. at 158).  He recalls this conversation as having also occurred in mid-October.  (McElroy Dep. at 156).  Ms. Collins claims that the plaintiff was informed of the freeze much earlier, in the first week of September.  (Collins Dep. at 39-41, 162).  It was at this point that Ms. Collins says Mr. McElroy offered to volunteer his services to the school. (Collins Dep. at 40-41, 163).  For his part, Mr. McElroy claims that Ms. Collins and Ms. Stanton assured him throughout the period that he worked at Wadleigh that he would be paid shortly.  (McElroy Dep. at 156).  Moreover, he says that Ms. Stanton led him to believe that

---

[3] A "nomination form" for Mr. McElroy for the position of school aide was apparently completed by the school on November 10, 2004, though this form itself does not appear in the record. (Stanton Dep. at 112-13, 126).

Ms. Watts might have the power to hire him as a school aide despite the hiring freeze. (McElroy Dep. at 160). Ms. Collins claims that she told Mr. McElroy that the hiring freeze might last for some time and encouraged him to find alternate employment. (Collins Dep. at 89-90, 163).

Ms. Watts was aware that Mr. McElroy was working at Wadleigh, but Ms. Collins told her that he was volunteering. (Watts Dep. at 53-54, 93-94). She and Ms. Stanton both testified, and Ms. Collins essentially agreed, that it was not normal practice to have volunteers at the school, that there were no other volunteers at Wadleigh at that time, and that there have been none since then. (Watts Dep. at 75-76; Stanton Dep. at 124-25; Collins Dep. at 163).

In late October, Mr. McElroy apparently requested that Wadleigh confirm his employment so that he could rent an apartment. (Excerpts of Deposition of Pamela Nurse dated April 28, 2006 ("Nurse Dep."), attached as Exh. K to Bodden Decl., at 9-12). As a result, Ms. Collins furnished a letter on October 28 that read as follows:

> Will McElroy has worked for Wadleigh Secondary School as a video technician since August 30 2004, but because of scheduling conflicts, hiring freezes, and slow paperwork he was not put on payroll until recently. The school is issuing him a check to cover the period of August 30th - November 1st 2004. I understand that he needs his check stubs in order to gain approval for an apartment he is interested in renting. Please accept this letter as proof of his current job status at Wadleigh Secondary School.

(Collins 10/28/04 Letter).  On the same day, Ms. Collins appears to have completed a form entitled "Verification of Employment Income" on behalf of Mr. McElroy.  (Verification of Employment Income Form, attached as Exh. L to Bodden Decl.).  This form lists Mr. McElroy's date of hire as "8/30/04," his position as "Video and Computer Technician," and his salary as "$384 per week" with anticipated gross earnings for the next twelve months estimated at $20,046.  (Verification of Employment Income; Nurse Dep. at 12-13).

In late November and early December, Ms. Collins paid Mr. McElroy a total of seven hundred dollars for his work on a school production.  (Collins Dep. at 65-66; copies of checks, General School Fund request for expenditure, and copies of school checkbook ("Payment Documents"), attached as Exh. N to Bodden Decl.).  Two hundred dollars was paid with a check from Ms. Collins' personal checking account dated November 4, 2004, while five hundred was paid directly from school funds with a check dated December 2, 2004.  (Collins Dep. at 65-66; Payment documents).  Ms. Collins was later reimbursed by the school for the amount she paid out of her personal account.  (Payment Documents).  The school check is listed as being for "Tech Stipend - Sound," while Ms. Collins' personal check bears a notation that reads "Sound Design - Born to Sing." (Payment Documents).

Sometime in the late fall of 2004, Mr. McElroy became frustrated with delays in the hiring process and stopped working at

Wadleigh.  Ms. Collins testified that the plaintiff left Wadleigh in early November (Collins Dep. at 168), while Mr. McElroy says that he continued working at Wadleigh until December.  (McElroy Dep. at 87).  Mr. McElroy's time sheets cover only September and October.  In late January and early February, Mr. McElroy underwent a physical examination and a tuberculosis test, two steps required for employment by the DOE.[4]  (Letters from Medical Clinics, attached as Exh. P to Bodden Decl.).

Mr. McElroy claims that throughout the period he worked at Wadleigh, he filled out and submitted numerous job applications, employment histories, medical examination results, and other forms in an effort to complete the hiring process.  (McElroy Dep. at 109-18, 120-27).  He remembers dropping off some of these forms at both the DOE regional office on Seventh Avenue and at the main office at 65 Court Street, but does not remember which forms he dropped off or whether he ever completed certain specific employment documents. (McElroy Dep. at 109-18). Ms. Stanton, Ms. Collins, and Ms. Watts all remember giving Mr. McElroy various application materials to submit to the DOE, but they say they never received word from either Mr. McElroy or the DOE that he had completed those

---

[4] He claims that he was first tested in November 2004, but that when he attempted to deliver the results to the DOE, they were rejected because the doctor had not filled out the proper forms. (McElroy Dep. at 109-10, 131-33).  The DOE has no record of previous medical tests for Mr. McElroy (Rivera Decl., ¶ 5; Restivo Decl., ¶ 6), and Mr. McElroy has no copies of the results of these earlier tests.  (McElroy Dep. at 133).

materials.  (Stanton Dep. at 87-89, 91, 95, 126-28; Watts Dep. at
48, 93; Collins Dep. at 57, 120-22, 163-64).  Ms. Stanton testified
that Mr. McElroy never gave her the "Authorization to Employ" form
from the DOE, which is given to an employee once his application
materials are complete and which is necessary to add an employee to
the school's payroll.  (Stanton Dep. at 70-71).  In addition, as
noted above, several DOE officials testified that no completed
employment application, personnel investigation, or background
records (apart from the fingerprinting results), personnel file,
payroll, or other records concerning Mr. McElroy are on file at any
DOE office.  (Rivera Decl., ¶¶ 5-10; Restivo Decl., ¶¶ 4, 7;
Declaration of Carmela Cuddy dated June 14, 2006 ("Cuddy Decl."),
¶¶ 6-9).  Such documents are required for employment by the DOE.
(Rivera Decl., ¶¶ 8-9; Restivo Decl., ¶ 7).  It is undisputed that
Mr. McElroy never took the civil service examination that is
required for computer technicians.  (McElroy Dep. at 79).

Mr. McElroy filed his complaint in this action on June 8,
2005.  Discovery has been completed, and the parties have filed
cross-motions for summary judgment.  The defendants have since
conceded liability on Mr. McElroy's FLSA claims,[5] although there is
still a dispute regarding the amount of damages to which he is
entitled on those claims.

_____

   [5] Defense counsel informed the Court during a conference on
March 9, 2007 that the defendants conceded liability under the
FLSA.

Discussion

    A.  Summary Judgment Standard

    Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Marvel Characters, Inc. v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002); Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co., 189 F.3d 208, 214 (2d Cir. 1999).

    The party moving for summary judgment bears the initial burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations marks omitted).  Where the moving party meets that burden, the opposing party may not "rest upon the mere allegations or denials of the [its] pleading," but must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The non-moving party must make "a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

    In assessing the record to determine whether there is a

genuine issue of material fact, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995).  However, the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," Anderson, 477 U.S. at 249 (citation omitted), and must grant summary judgment where the nonmovant's evidence is "merely colorable" or not significantly probative.  Id. at 249-50 (citations omitted).  "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997) (internal quotation marks and citations omitted); see also Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (a nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").  In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue

13

for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting <u>First National Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 288 (1968)).

    A.  <u>FLSA and New York Labor Law Claims</u>

As noted above, the defendants concede that Mr. McElroy was an employee of the DOE for purposes of the FLSA, and thus also for the purposes of the New York Labor Law.[6]  The only dispute remaining with regard to the plaintiff's claims under the FLSA concerns the number of hours for which he may recover unpaid wages.  The defendants acknowledge an obligation to compensate Mr. McElroy at the rate paid to a school aide, but only for the 170 hours of work reflected on the time sheets.  (Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment ("Def. Rep. Memo.") at 1).  Mr. McElroy claims that he worked substantial additional hours that are not reflected on the time sheets.

Aside from the time sheets, there is little direct evidence of the number of hours worked by Mr. McElroy.  The plaintiff testified that he worked Monday through Friday from 8:30 a.m. until 3:30 or 4:00 p.m.  (McElroy Dep. at 86).  He also stated that sometimes he worked until 6:00 or 7:00 p.m. on after school programs.  (McElroy

---

    [6] In this Circuit, the FLSA and New York Labor Law are generally interpreted consistently with each other with respect to the definitions of "employer" and "employee."  <u>See</u> <u>Ling Nan Zheng v. Liberty Apparel Co.</u>, 355 F.3d 61, 78-79 (2d Cir. 2003) (applying same analysis to New York Labor Law as to FLSA); <u>Topo v. Dhir</u>, No. 01 Civ. 10881, 2004 WL 527051, at *3-*4, (S.D.N.Y. March 16, 2004) (same); <u>Lopez v. Silverman</u>, 14 F. Supp. 2d 405, 411 n.4 (S.D.N.Y. 1998) (same).

Dep. at 86).   The defendants provide no testimony regarding the hours he worked.   As noted above, the time sheets record substantially fewer hours than those described by the plaintiff.[7] Mr. McElroy is shown on most days as having worked less than a full 8:30 to 3:30 work day.  For seven weekdays in September and five in October, no hours are recorded at all.

Mr. McElroy also testified that he worked at Wadleigh from August 30, 2004 until sometime in December 2004.  (McElroy Dep. at 87).  Ms. Collins, however, remembers Mr. McElroy leaving Wadleigh in early November.  (Collins Dep. at 168).  A form nominating Mr. McElroy for the position of school aide appears to have been completed by Wadleigh on November 10, though it is of course possible that Mr. McElroy had left Wadleigh by that point. Meanwhile, the time sheets only record hours worked in September and October of 2004.  Drawing all inferences in favor of the plaintiff as the non-movant, see Anderson, 477 U.S. at 255, there is a triable issue of fact as to the number of hours Mr. McElroy worked for Wadleigh and for which he must be compensated under the FLSA and the New York Labor Law.  Accordingly, I recommend that summary judgment on this point be denied and that the issue of damages under these statutes be determined at trial.

---

[7]   Ms. Collins claims that Mr. McElroy himself kept the time sheets.  (Collins. Dep. at 64-65, 67-69).  There is no testimony from Mr. McElroy on this point.

B. Breach of Contract Claim

The defendants move for summary judgment on the plaintiff's claim for breach of contract.   In his complaint, the plaintiff alleges that

> Defendants entered into an oral employment contract with Plaintiff that specified the amount and timing of payment for his work.  Plaintiff agreed to Defendants' terms, was hired as an at-will employee, and worked for Defendants for varying periods of time under the terms of the contract.

(Compl., ¶ 32).  He asserts that the defendants failed to pay him for the contracted-for work and that this constitutes a breach of the contract.   (Compl., ¶¶ 33-35).

The defendants raise three principal arguments.  First, they contend that even assuming there was a contract between Wadleigh and Mr. McElroy, it was invalid because it violated either the New York Civil Service Laws or the relevant collective bargaining agreement.  (Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Memo.") at 9).   Second, the defendants claim that the purported oral contract would be void under the New York Statute of Frauds.  (Def. Memo. at 10).   Finally, they assert that any oral contract would fail for lack of definiteness or certainty.   (Def. Memo. at 11).   For the reasons that follow, summary judgment should be granted for the defendants as to the existence of a contract for Mr. McElroy to work as a computer technician, but should be denied with regard to the existence of a

contract for the position of school aide.

1.   The Computer Technician Position

As explained above, the plaintiff claims that he was offered, and that he accepted, a computer technician position at Wadleigh. The defendants argue that because the job of computer technician in New York schools is a civil service position, the "[p]laintiff could not bypass the civil service examination by entering into his own separate oral employment contract with the defendants." (Def. Memo. at 9).  It is a basic principle of contract law that "[a] promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms."  Restatement 2d of Contracts § 178; see also Cary Oil Co. v. MG Refining & Marketing, Inc., 230 F. Supp. 2d 439, 451 (S.D.N.Y. 2002); Nagel v. ADM Investor Services, 217 F.3d 436, 439 (7th Cir. 2000)(collecting cases for proposition that "contracts made in violation of law are unenforceable"); Development Finance Corp. v. Alpha Housing & Health Care, Inc., 54 F.3d 156, 163 (3d Cir. 1995)("[A]n agreement which violates a provision of a statute, or which cannot be performed without violation of such a provision, is illegal and void." (quotation marks and citation omitted)). Notwithstanding that general principle, "many cases continue to treat the defense of illegality to the enforcement of a contract as

17

presumptive rather than absolute, forgiving minor violations and not allowing the defense to be used to confer windfalls." <u>Nagel</u>, 217 F.3d at 440.  "[S]ome federal courts have . . . refused to enforce illegal contracts only if the statute or regulation explicitly provides that contracts in violation are void or if the interest in enforcement clearly outweighs the public policy against enforcement." <u>Resolution Trust Corp. v. Home Savings of America</u>, 946 F.2d 93, 96-97 (8th Cir. 1991).

The New York Civil Service Law provides that "no person shall be assigned to perform the duties of any position unless he has been duly appointed, promoted, transferred or reinstated to such position in accordance with the provisions of this chapter and the rules prescribed thereunder." N.Y. Civ. Serv. Law § 61(2).  It is undisputed that Mr. McElroy was not appointed pursuant to the provisions of the Civil Service Law.  The alleged agreement by Wadleigh to appoint him as a computer technician without complying with the Civil Service Law would contravene the statute and would therefore be void. <u>Pleva v. Norquist</u>, 195 F.3d 905, 915 (7th Cir. 1999) (finding that plaintiff's alleged employment contract was void because it violated municipal law governing hiring); <u>Shlay v. Montgomery</u>, 802 F. 2d 918, 921-22 (7th Cir. 1986) (same).

Even were I to balance the interest in enforcement of the contract against the public policy reflected in the statute, as some courts have done, the result would be the same.  The New York

Civil Service Law was created to prescribe the manner in which covered positions are to be filled and to eliminate independent bargaining for those positions.  Thus, the public policy against enforcement of a contract such as the one alleged by the plaintiff is substantial.  Moreover, the defendants receive no significant windfall as a result of a determination that the contract is void. The plaintiff may recoup the fair value of the labor he performed for the defendant under the principles of quantum meruit. Consequently, this is not a case "in which the interest in enforcement [of the contract] clearly outweighs the public policy against [its] enforcement."  Resolution Trust Corp., 946 F.2d at 97.  Accordingly, summary judgment should be granted to the defendants with respect to Mr. McElroy's claim that he entered into an oral employment contract to work as a computer technician at Wadleigh.

          2.  The School Aide Position

    The school aide position that the defendants claim was offered to Mr. McElroy is covered by a collective bargaining agreement with Local 372 of District Council 37 American Federation of State, County and Municipal Employees, AFL-CIO.  (Collective Bargaining Agreement, attached as Exh. G to Gill Decl.).  The defendants argue that the collective bargaining agreement precluded the plaintiff from negotiating independently with the defendants for a covered position.  (Def. Rep. Memo. at 2).  However, the collective

19

bargaining agreement between the DOE and the union does not prescribe hiring practices for school aides.  Thus, Mr. McElroy's appointment by Wadleigh does not appear to violate the provisions of the agreement.  I can find no authority, nor do the defendants cite any, for the proposition that the mere existence of a collective bargaining agreement covering a certain position renders illegal an independently-negotiated agreement by the employer to hire someone for that position.[8]  Accordingly, the defendants' motion for summary judgment on the plaintiff's claim for breach of contract should be denied with regard to school aide the position.

　　3. Statute of Frauds

　　The New York Statute of Frauds provides in relevant part that

　　a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged

---

　　[8] In Caldwell v. American Basketball Association, Inc., 66 F.3d 523 (2d Cir. 1995), the Second Circuit held that, in the context of the National Labor Relations Act (the "NLRA"), "[o]nce a union has been selected as a collective bargaining representative, the NLRA 'extinguishes the individual employee's power to order his own relations with his employer.'" Id. at 528 (quoting NLRB v. Allis-Chalmers Manufacturing Co., 388 U.S. 175 (1967).  At that point, "[o]nly the union may contract the employee's terms and conditions of employment[.]" Allis-Chalmers, 388 U.S. at 180.  However, the Department of Education, as a state agency, is exempted from the NLRA.  See Richardson v. City of New York, No. 87 CV 214, 1988 U.S. Dist. LEXIS 16749, at *44 (E.D.N.Y. October 14, 1988).  Moreover, Caldwell concerned a plaintiff who was already employed in a position covered by the collective bargaining agreement and who then sought to renegotiate the terms of his employment outside of the collective bargaining process.  Thus, the holding in Caldwell does not apply to Mr. McElroy's situation.

> therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime. . . .

N.Y. General Obligation Law § 5-701, accord Zaitsev v. Salomon Brothers, 60 F.3d 1001, 1003 (2d Cir. 1995).  The Statute of Frauds was intended to prevent "fraud in the proving of certain legal transactions particularly susceptible to deception, mistake and perjury[.]"  D & N Boening, Inc. v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 453, 483 N.Y.S.2d 164, 165 (1984).  "A contract that is 'capable' of being performed within one year of its making is outside the statute."  Zaitsev, 60 F.3d at 1003 (quoting North Shore Bottling Co. v. C. Schmidt and Sons, Inc., 22 N.Y.2d 171, 176, 292 N.Y.S.2d 86, 89 (1968)).  The New York Court of Appeals has held that this provision of the Statute of Frauds applies only to contracts "which, by their terms, 'have absolutely no possibility in fact and law of full performance within one year.'"  Cron v. Hargro Fabrics, Inc., 91 N.Y.2d 362, 366, 670 N.Y.S.2d 973, 975 (1998)(quoting D & N Boening, 63 N.Y.2d at 454, 483 N.Y.S.2d at 165).  Therefore, "[a]s long as the agreement may be fairly and reasonably interpreted such that it may be performed within a year, the Statute of Frauds will not act as a bar however unexpected, unlikely, or even improbable that such performance will occur during that time frame."  Id. (quotation marks and citations omitted); see also Ohanian v. Avis Rent A Car System, Inc., 779

F.2d 101, 106 (2d Cir. 1985).

Here, the plaintiff asserts that the offer of employment from Ms. Collins on behalf of Wadleigh was for the 2004-2005 school year and thus was capable of being performed within one year. (Pl. Memo. at 20). Defendants offer no evidence to the contrary, but assert that "the alleged oral contract between plaintiff and defendants does not specify the duration of the employment contract" and thus "constitutes a contract of indefinite duration." (Def. Memo. at 11). However, "[a]n indefinite employment contract is presumed to be a hiring at will, terminable at any time by either party," and therefore "the [S]tatute of [F]rauds is not a bar to enforcement of [such an] agreement because its performance within one year [is] possible." Stucklen v. Kabro Associates, 18 A.D.3d 461, 462, 795 N.Y.S.2d 256, 257 (2d Dep't 2005) (internal citations omitted); see also Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 463, 457 N.Y.S.2d 193, 196 (1982)(finding employment contract of indefinite term "is not one which, by its terms, could not be performed within one year and, therefore, is not one which is barred" by the Statute of Frauds (quotation marks and citations omitted)); Hayden v. P. Zarkadas, P.C., 18 A.D.3d 500, 501, 795 N.Y.S.2d 278, 279 (2d Dep't 2005)(alleged oral employment contract constituted at-will employment that could be performed within one year and was therefore not subject to Statute of Frauds); Gold v. Katz, 193 A.D.2d 566, 566, 598 N.Y.S.2d 205, 206 (1st Dep't 1993)

22

(same).

The cases cited by the defendants hold no differently.   In D & N Boening, the agreement in question was to last "for as long as [the plaintiff] satisfactorily distributed the product, exerted [its] best efforts and acted in good faith," an agreement which is by its terms indefinite in duration.   63 N.Y.2d at 452, 438 N.Y.S.2d at 164.   The contract in Andruff v. World Travel Holdings, PLC, No. 01 Civ. 10717, 2002 WL 1033811 (S.D.N.Y. May 22, 2002), was for two years and could only be terminated upon plaintiff's breach, and therefore violated the Statute of Frauds.   Id., at *2-3.   Finally, the dispute in Huntington Dental & Medical Co. v. Minnesota Mining and Manufacturing Co., No. 95 Civ. 10959, 1998 WL 60954 (S.D.N.Y. Feb. 13, 1998), involved an alleged 15-year contract; moreover, the contract was for the sale of more than $500 in goods and thus was barred by Section 2-201(1) of the Uniform Commercial Code as well as New York General Obligation Law § 5-701(a)(1).   Id., at *3-4.

In sum, whether Wadleigh and Mr. McElroy entered into a contract is certainly in dispute, but assuming that a contract existed, it cannot now be established that there is "absolutely no possibility in fact and law of full performance within one year." Cron, 91 N.Y.2d at 366, 670 N.Y.S.2d at 975; see also Shaftel v. Dadras, 39 F. Supp. 217, 229 (E.D.N.Y. 1999) ("Typically, dispositive motions should be denied where issues of material fact

exist with respect to whether a particular contract falls within the Statute of Frauds."). Accordingly, summary judgment based on the Statute of Frauds should be denied.

    4.  Definiteness or Certainty

    The defendants also contend that Mr. McElroy could not have formed a valid contract with Wadleigh because the terms of the alleged agreement were not sufficiently certain. They claim that Mr. McElroy "is uncertain as to what position he sought" and cannot offer any "objective verifiable evidence" as to the salary or hours he was required to work under the contract. (Def. Memo. at 11-12).

    "In order for an agreement to be enforced, 'it must be sufficiently definite and explicit so that the parties' intention may be ascertained to a reasonable degree of certainty.'" Van Diepen v. Baeza, No. 96 Civ. 8731, 1998 WL 199909, at *7 (S.D.N.Y. Feb 26, 1998) (quoting Best Brands Beverage, Inc. v. Falstaff Brewing Corp., 842 F.2d 578, 587 (2d Cir. 1987)). Moreover,

> [a]lthough courts are loath to refuse enforcement of agreements on indefiniteness grounds, if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract. Moreover, there can be no contract if the parties have failed to agree on all essential terms, and if the missing terms cannot be supplied through reasonable construction that is consistent with the parties' intent.

Best Brands Beverage, 842 F.2d at 587-88 (internal citations and

quotation marks omitted).  However, "New York law recognizes that contracting parties are often imprecise in their use of language . . . and New York courts therefore do not rigidly apply the doctrine of definiteness." <u>Van Diepen</u>, 1998 WL 199909, at *7; <u>see also 166 Mamaroneck Avenue Corp. v. 151 E. Post Road Corp.</u>, 78 N.Y.2d 88, 91, 571 N.Y.S.2d 686, 687-88 ("Imperfect expression does not necessarily indicate that the parties to an agreement did not intend to form a binding contract. A strict application of the definiteness doctrine could actually defeat the underlying expectations of the contracting parties.").  Thus, "[b]efore rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear." <u>Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.</u>, 74 N.Y.2d 475, 483, 548 N.Y.S.2d 920, 923 (1989) (citing 1 Williston, Contracts § 47, at 153-56 (3d ed. 1957)).  "The conclusion that a party's promise should be ignored as meaningless is at best a last resort." <u>Id.</u> (quotation marks and citation omitted); <u>accord 166 Mamaroneck Ave. Corp.</u>, 78 N.Y.2d at 91, 571 N.Y.S.2d at 688.

Here, Mr. McElroy alleges that he was initially offered and accepted a job as a video or computer technician, and this account is largely confirmed by Ms. Collins.  (McElroy Dep. at 74; Collins Dep. at 34, 86-87).  There is other evidence that tends to confirm the plaintiff's claim:  the fingerprinting referral that states

that Wadleigh wished to hire him as a computer technician, the October 28 letter from Ms. Collins that refers to Mr. McElroy as a video technician, and the verification of income form, which lists Mr. McElroy's position as "video and computer technician." (Watts 9/3/04 Letter; Collins 10/28/04 Letter; Verification of Employment Income Form). Such evidence supports the plaintiff's contention that the alleged oral employment agreement set out his position in sufficiently definite terms.[9]

With respect to the issue of Mr. McElroy's rate of pay, "[t]he general rule is that . . . an agreement must be definite as to compensation." Van Diepen, 1998 WL 199909, at *8 (quoting Ellenberg v. Schneider, 441 N.Y.S.2d 581, 585 (Sup. Ct. N.Y. Co. 1981)). "[A] compensation clause is not indefinite, however, simply because it fails to specify a dollar figure or a particular compensation." Id. "Where at the time of agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the partie[s]." Cobble Hill Nursing Home, 74 N.Y.2d at 483, 548 N.Y.S.2d at 206. Here, the hourly rate for a school aide is fixed by the collective bargaining agreement at $9.60 and thus can be determined objectively. (Collective Bargaining Agreement at 6). This is

---

[9] Although, as discussed above, Mr. McElroy could not have contracted for the position of computer technician, he could have been hired as a school aide with the title of "video technician."

confirmed by the Verification of Employment form filled out by Ms. Collins, in which she lists Mr. McElroy's compensation at that amount.   This figure is sufficiently definite to allow Mr. McElroy's breach of contract claim to survive summary judgment.

For these reasons, summary judgment should be denied with respect to the plaintiff's breach of contract claim.

### C. Quantum Meruit

"The doctrine of quantum meruit or quasi contract was developed by the law in order to make sure that a person who receives the benefit of services pays the reasonable value of such services to the person who performed them."   Zolotar v. New York Life Insurance Co., 172 A.D.2d 27, 33, 576 N.Y.S.2d 850, 854 (1st Dep't 1991).   In order to recover in quantum meruit, New York law requires a claimant to establish "(1) the performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."   Martin H. Bauman Associates, Inc. v. H & M International Transport, Inc., 171 A.D.2d 479, 484, 567 N.Y.S.2d 404, 408 (1st Dep't 1991) (quoting Moors v. Hall, 143 A.D.2d 336, 337-38, 532 N.Y.S.2d 412, 414 (2d Dep't 1988)).

The defendants argue that the plaintiff's quantum meruit claim is barred as an attempt to circumvent the Statute of Frauds.   See

American-European Arts Associates, Inc. v. Trend Galleries, Inc., 227 A.D.2d 170, 171, 641 N.Y.S.2d 835, 836 (1st Dep't 1996)("[P]laintiffs may not utilize a quantum meruit theory of recovery to circumvent the Statute of Frauds."). But as detailed above, Mr. McElroy's breach of contract claim survives summary judgment on Statute of Frauds grounds. Therefore, the plaintiff's claim of quantum meruit cannot be barred as an effort to avoid the Statute of Frauds.

The defendants also argue that "because the plaintiff cannot prove the existence of a valid contract," he is precluded from recovery under quantum meruit. (Def. Memo. at 13). But this is precisely backward. "[T]he existence of a valid and enforceable contract generally <u>precludes</u> quasi-contractual recovery."[10] <u>Nakamura</u>, 253 A.D.2d at 390, 677 N.Y.S.2d at 116 (citing <u>Clark-Fitzpatrick, Inc. v Long Island Railroad Co.</u>, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656 (1987))(emphasis added); <u>accord</u> <u>Unisys Corp. v. Hercules Inc.</u>, 224 A.D.2d 365, 370, 638 N.Y.S.2d 461, 464 (1st Dep't 1996).

The defendants rely for their proposition entirely upon

---

[10] Moreover, a party is not precluded from proceeding against another party on both breach-of-contract and quasicontract or quantum meruit theories of recovery where there is a bona fide dispute as to the existence of the contract. <u>Wilmoth v. Sandor</u>, 259 A.D.2d 252, 254, 686 N.Y.S.2d 388, 390 (1st Dep't 1999); <u>Nakamura v. Fujii</u>, 253 A.D.2d 387, 390, 677 N.Y.S.2d 113, 116 (1st Dep't 1998).

Sonnenblick-Goldman Corp. v. Penn Central Corp., No. 84 Civ. 7227, 1986 WL 8312, at *8 (S.D.N.Y. July 24, 1986).  In that case, the plaintiff real estate brokerage ("S-G") sued the defendant property owner ("Penn Central") alleging that the property owner had employed the brokerage to sell a property but then rejected the brokerage's proposed buyer and sold the property to someone else, depriving the brokerage of its commission.  Id., at *1.  Central to the court's denial of the plaintiff's claim in that case was the finding that "Penn Central had not employed S-G [] as its broker or to procure a purchaser on its behalf" and thus that "the services S-G rendered were for the benefit of [the purchaser] and not Penn Central."   Id., at *7-8.   Thus, the court's statement that "[a]bsent a contractual relationship from which a promise to pay for services received may be inferred, there can be no recovery in quantum meruit," which the defendants reference, is inapplicable to the current case.  In Sonnenblick-Goldman, there was no recovery because the plaintiff S-G was not acting for the benefit of the defendant Penn Central but instead on behalf of the purchaser.  In the absence of any relationship between S-G and Penn Central, S-G could not recover in quantum meruit because it had not performed any service for Penn Central, nor had Penn Central accepted any service from it.  As the court stated, "[a] broker cannot recover in quantum meruit unless it was employed by the owner."  Id., at *8.  Mr. McElroy's relationship with Wadleigh was quite unlike that

of broker and client.  The services he rendered did not stand to benefit him apart from his regular pay -- there was no commission involved -- nor was he acting on behalf of a third party.  In short, the context is completely different, and the case relied on by the defendants is inapposite.

As noted above, recovery in quantum meruit requires that the plaintiff perform services in good faith and with an expectation of compensation, that the defendant accept those services, and that the plaintiff prove their reasonable value.  Without engaging in extensive analysis at this time, it is clear that the plaintiff has adduced sufficient evidence of each of these elements to survive summary judgment.

Finally, the defendants suggest that the plaintiff's recovery under the FLSA would "more than satisfy the requirements for relief" under quantum meruit.[11]  (Def. Reply Memo. at 7).  Under quantum meruit, a plaintiff is entitled to recover the reasonable value of services rendered.  Moors, 143 A.D.2d at 338, 532 N.Y.S.2d

---

[11] The defendants also suggest that "setting apart any claims . . . under the FLSA and New York Labor Law, [the plaintiff's] quantum meruit claim would be satisfied by . . . the five hundred dollar stipend he received."  (Def. Reply Memo. at 7).  It is not entirely clear what the defendants mean by this.  Certainly, it seems likely that the plaintiff is entitled to more than 500 dollars total in compensation for the 170 or more hours of work he performed for Wadleigh.  If they mean that the plaintiff is not entitled to more than 500 dollars in addition to any damages he receives under the FLSA, that seems a question to be resolved at trial, not at the summary judgment stage.

at 414.  The value of the services is an issue of fact and must be determined at trial.  Accordingly, I recommend that the defendants' motion for summary judgment on the plaintiff's quantum meruit claim be denied.

     D. <u>Plaintiff's Claims Against the City</u>

     The defendants contend that the plaintiff's claims against the City of New York must be dismissed.  "[I]t is well-settled that the [Department] of Education and the City of New York are separate and distinct entitie[s]."  <u>Campbell v. City of New York</u>, 203 A.D.2d 504, 505, 611 N.Y.S.2d 248, 249 (2d Dep't 1994); <u>accord Marrero v. City of New York</u>, No. 02 Civ. 6634, 2004 WL 444548, at *2 (S.D.N.Y. March 10, 2004); <u>Gonzalez v. Esparza</u>, No. 02 Civ. 4175, 2003 WL 21834970, at *2 (S.D.N.Y. Aug. 6, 2003).  Under New York Education law, the DOE is "for all purposes, [] the government or public employer of all persons appointed or assigned by the city board or the community districts" and is statutorily empowered to appoint all staff and instructors in its schools.  N.Y. Educ. Law §§ 2554(2), 2590-g(2).  Thus, Mr. McElroy's complaint states a claim only against the DOE, not against the City of New York, and the City should be dismissed as a defendant.  <u>See, e.g.</u>, <u>Falchenberg v. New York City Department of Education</u>, 375 F. Supp. 2d 344, 347 (S.D.N.Y. 2005); <u>Marrero</u>, 2004 WL 444548, at *2; <u>Gonzalez</u>, 2003 WL 21834970, at *2.

Conclusion

For the reasons set forth above, I recommend that summary judgment be granted for the plaintiff as to liability on his claims under the FLSA and New York Labor Law but that the issue of damages be reserved for trial in light of the facts that remain in dispute. I recommend that the defendants' motion for summary judgment be granted on the plaintiff's claim for breach of contract with regard to a position as computer technician, but denied with regard to the school aide position. I further recommend that the defendant's motion for summary judgment on the plaintiff's claim for quantum meruit be denied. In addition, I recommend that the City of New York be dismissed as a defendant.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Jed Rakoff, Room 1340, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

James C. Francis IV
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       June 26, 2007

Copies mailed this date:

Marlen Bodden, Esq.
The Legal Aid Society, Civil Division
199 Water Street
New York, NY 10038

Rippi Gill, Esq.
Assistant Corporation Counsel
New York City Law Department
100 Church St.
New York, NY 10007